I believe that all counsel are present. So we will hear the first case, Purcell v. New York Institute of Technology. Good morning. May it please the Court. My name is Stuart Carlin. I'm representing the appellant, John Purcell, on this matter. The issue in this case is actually very, very narrow. It's whether, when an academic determination is tinged with some sort of, at least it's alleged that it's tinged with some sort of discriminatory intent, whether an Article 78 proceeding is really the only exclusive remedy that a student has. And I would respectfully submit that a student can proceed under Title VI and under Title IX under the federal law. In your, this Court has been clear in the Cuarto decision that a three-year statute of limitations  And if you look at the Felder case, which is a Supreme Court case, it states clearly that a notice of a claim requirement isn't required or mandatory in a 1983 action. Can I ask you, in terms of your preemption claim, I believe you didn't make that objection, you didn't make that claim before the magistrate. Well, we didn't do it directly. I mean, we distinguished the state law claims and then we did cite the Cuarto case saying that the three-year statute of limitations, we thought it was so obvious, to be quite frank, we thought it was so obvious that the three-year statute of limitations applied in this case that we didn't go in length that this is a preemption argument. I don't even think it's actually a preemption argument. If somebody's free, that means there's a conflict in the law. Somebody's certainly free to commence an Article 78 proceeding if they want to. Nothing is preventing them from doing that. Can you tell me what happened after the magistrate judge ruled? Did you object to that? Yes. You objected at the— After the report. After the report. Right. Okay. So we thought it was actually so obvious. And this isn't like an Arista case where it's like a clear case of preemption. We just cited the federal law saying this is a federal statute. If you look at Wilson v. Garcia, the court said, if the choice of the statute of limitations were to depend on the particular facts or the precise legal theory of each claim, different statutes of limitation would be applied to various 1983 claims arising in the same action, and multiple periods of limitation would apply to the same case. And thus they decided—and by the way, that's what happened in this particular case. Ultimately, there was a three-year statute of limitations with respect to the hostile work environment claim and a four-month statute of limitations to an academic determination where it was alleged that plaintiff's disability and sexual orientation caused his— I guess your main argument is why should New York be allowed to cut off the statute, three-year statute of limitations in a federal claim in any particular area, and this area happens to be in academic decision-making, where you have a three-year period in every other context. Why should New York be permitted to somehow do this as to federal claims? I mean, that's what you're basically asking the question, right? Yes, that's precisely correct. But if these were all state claims and state discrimination claims, then you could see the Article 78 coming into play. Right, because they have—the court, the public division of the Court of Appeals, has a right to interpret their own state statutes. But here we're dealing with a federal claim, and this was again echoed in Owens, another Supreme Court case where, again, the court said that you don't look at the specific theory or else you have this kind of situation which came about. And there they specifically rejected the one-year statute of limitations on intentional torts and said, no, the three-year statute should apply. You have to have uniformity in the rule. So at the end of the day— I assume you're right here. What is the tie-in here? You're trying to—you're alleging some sort of continuing violation. Well, I would rest on—there's two claims here. One's a hostile work environment claim that started in 2010. I would rest on the papers on that. My main focus here is the determination which we allege specific facts in the complaint that caused, because of my client's disability and sexual orientation, to not be reinstated into the medical program. So that's my focus today. You're not pressing what happened in 2013 and 2014. Correct. So what happened in 2010 and 2011 you're not pressing? Well, I am pressing, but it's already been briefed, and I have seven minutes. There was a two-year gap. Yes. And that's your problem there. Correct. So how do you explain the two-year gap? Why isn't that a problem for your analysis? Actually, it was about an 18-month gap because there's some case law that says that you could have acts that occur even a year and a half apart where it's going to help to be a continuing violation. So if you look at the 2010-11 allegations and the 2013-14 allegations, correct me if I'm wrong, there's only one of the named harassers involved in both, allegedly Ms. Axinger. Isn't that correct? Yes. And then all the other comments come in either from either named harassers who don't comment onto the scene until later or from unnamed faculty members. Yes, although we did receive the texts. Who was the fellow who commented about he wouldn't want to get in the car, but it was broken? Was that the same guy who also said something back in the earlier period? I believe so. I mean, I'd have to double-check. Is it your point that if there was no continuing violation, that the later claims, your complaint alleges, which is discrimination, I guess it's still based on disability and so forth, could be informed by the evidence of the earlier period, even though maybe those would not be actionable? The earlier period might not be actionable, but still the evidence from the earlier period would be relevant? Yes, you're right. It would be relevant, even though it's not before the court. The only thing really that's before the court is the statute of limitations issue, but certainly any prior conduct would indicate prior history. It could be relevant to the ultimate question as to whether or not the decision not to reinstate him was due to his disability. The only thing is the statute of limitations period. The failure to reinstate, the dismissal, and so forth fell within three years. Yes. Right. But are you saying that there's no failure to state a claim allegation as to that period? Well, I think that the decision— That's not an issue in the case? No, I don't think it is. I think the only issue was that the court dismissed the case and held the four-month statute of limitations applied across the board to both claims, and therefore the claims were untimely and the whole action was dismissed. Okay. Thank you. Okay. Thank you. Your Honors, my name is Douglas Catalano from Clifton Budd and DeMaria. With respect to— We rule against you on the four-month statute of limitations. At that point, then, what would your position be? I mean, you'd have to go back to the district court for any further motions as far as failure to state a claim or anything of that sort for the latter period, right? Well, of course, Your Honor, I can't presage how your decision would come up. But, yes, we would be remanded to the district court, of course. I'm not suggesting our decision would go. I'm just proposing that as a possibility. We would have to go back to the district court. But may I say a few things with respect to these issues? If not directly, surely indirectly, in a case called Atala v. New York College of Osteopathic Medicine, which were in the main similar, if not almost identical, facts several years ago. Mr. Atala, who had been dismissed— Well, that's the claim being made by plaintiff here. But in that case, right, in Atala, that's a 1983 procedural due process case, right? Yes. And federal due process doctrine suggests that there isn't a due process problem if there is an adequate state procedure available. In Article 78, proceedings are adequate state procedures under that doctrine. But that's still applying federal law. What federal law doctrine says that the ADA or Title IX claims have to be brought in state court? I'm sorry, Judge, I'm not clear as to what your question is. There isn't one case that I'm aware of that can be cited by the plaintiffs, and pardon me if we've overlooked it, where a dismissal from a college or university which includes, as a buttressing the case, claims of discrimination are not guided by the four-month statute of limitations, that is to say in Article 78 proceedings, which is exactly what occurred in Atala. Atala sought to claim that his Section 1983 rights were somehow infringed upon, and you held that, wait a second, he has an Article 78 remedy available to him. So essentially the 1983 claim was sublimated to the Article 78 procedural framework, which you upheld. That may not be true with regard to all federal claims. I know of no case, and the case is Allegiant, as cited by Magistrate Tomlinson, together in our brief and otherwise, where anything which... The New York State case is dealing with New York State law and state discrimination claims. Dawson v. NYU is a former student, brought a discrimination claim under Title VI. The Supreme Court, yes, the State of New York dismissed it. So that both federal and state discrimination statutes have been dismissed in the courts, and I would argue that the Atala case is not only informative, but it actually is the same reasoning that applies here. I know of no case where it was allowed to proceed the claim, which had as a basis, I was dismissed from the university because of discrimination. All of the cases lend themselves to the fact that the university... During the student who's at a university who may have a disability, may be gay or African American, and he's constantly targeted. I'm hypothesizing, not talking about this case. He's constantly targeted on the basis of those protective features by other students, and then by the faculty who join in, and ultimately he's discriminated against in various ways during the year, and ultimately dismissed. The worst possible set of facts you can think of. If he didn't bring his claim within four months, he's out. He can't bring it. With respect to the dismissal, in this instance, those kinds of claims or the analogous circumstance stem from Plaintiff's argument that back in 2010, 2011... Sagan? No, he's damaged. I mean, he's damaged by the dismissal, and that's the culmination of the activities that occurred. One could argue that Title VII or Title IX has been breached, but with respect to the dismissal, because we are informed by a university setting when he failed three different courses in his senior year... I'm not talking about these facts. I'm talking about there may well be... The only issue is the procedural framework. It must be commenced within four months under Article 78. And in fact, Plaintiff commenced this action in the Supreme Court, fully informed that the procedural framework would be applied. We removed it to the federal court because we understood the law to be that we can have this court decide whether an Article 78 proceeding is the proper framework within which the dismissal should be brought. What is your strongest Second Circuit case to support your thesis here? The Atala case, specifically, by this court. Atala says that Article 78 is a remedy available to the plaintiff, and therefore we will not proceed pursuant to Section 1983, and dismissed his Section 1983 claim. The federal statute threw out, with respect to the dismissal of Atala from the New York State... Do you have any case that says that the ADA or Title IX claims have to be brought in state court? Have to be brought? Yes. No, not have to be brought. I can't advert to a case right now. The substantive federal law might be that they can bring the federal statutory claim here, but he brought them in state court. He, Plaintiff. I don't mean Mr. Carla, of course. It's subject to Article 78. I mean, a due process claim, which basically alleges a set of facts, and the person wasn't given notice and a hearing, that kind of thing, and was dismissed so that there'd be allegedly a due process problem in the case. One can see how that would be, you know, part and parcel of what would be brought up under Article 78. If he had brought this within four months, he would be obviously free to pursue whatever he thought to be the basis for the dismissal. So, separate and apart, however, the whole body of law relates to this particular circumstance of a dismissal from the university, a university. There are a number. There are no cases to the contrary that I'm familiar with, Judge. All of the cases, whether it's NYU, Cornell, or otherwise, the cases consistently hold that some deference must be given to the academics as far as determining these kinds of issues. No one is precluded from raising the issues, but you must do so within the framework of a four-month statute of limitations where the alleged discriminatory acts are directly related to that determination, and that's the Kikertz case, which is the First Department, relating to the great schools here in New York City. Whether it's Cornell, I know it's upstate, but it also has an adjunct relationship here, NYU. The case is alleged. There are no cases to the contrary, and we're not suggesting that he wasn't capable of pursuing it, but we are saying you're not capable of pursuing it five years later or more than three years later, which is the circumstance here. So he sued in state court. I believe he was quite familiar with the fact that the procedural frameworks would apply. We removed it, and this relates to the claim of somehow the supremacy of the federal statutes. Again, I know of no case. Dawson v. NYU is a claim brought which relates to the same matter here, again affirmed last year by the First Department, so that in that case the plaintiff alleges that he was subjected to unlawful discrimination, but the complaint is actually a challenge to the university's academic and administrative decision. It's directly on point. That case, though, I understand. I've read that case as well. It doesn't, correct me if I'm wrong, it doesn't examine the question of whether state law jurisdictional doctrines can apply to federal claims, does it? It didn't specifically reject the so-called preemption argument, Judge. It didn't point to any federal law of that view. Well, it did. Title VI of the Civil Rights Act of 1964. Not separate. So, again, I think the cases are clear, and with respect to the 2010 and 2011, while we did not get to it, not only were they time-barred, but I would argue, of course, that they didn't actually set out a cause of action. These were just sporadic. That's not before us, right? It is not. Thank you. Thank you, Your Honor. Just a couple of points. Article 78, which basically the court ruled that we had to pursue, there's no mechanism to pursue an Article 78 proceeding in federal court, period. There's a line of cases which are cited in my brief saying that they have to be commenced in the New York State Supreme Court, which is the trial court in New York State. So, finally, if you look at the ramifications of the decision here, a plaintiff's exclusive remedy for a discriminatory academic determination by an academic institution through an Article 78 proceeding would preclude all plaintiffs from asserting their rights under federal discrimination statutes such as Title VI, Title IX, Title III of the ADA. Such a holding would preclude a student who was dismissed or denied acceptance to a school on the basis of race, religion, gender, disability, or sexual orientation, and challenging that decision under the applicable federal statutes, limiting them to basically an Article 78 proceeding. And as Your Honor said, going further, an African-American student who was clearly dismissed, even though it's couched in the terms of an academic determination on the basis of his race, or someone on the basis of their disability, would be limited to an Article 78 proceeding. This is not the intent of the federal law. A plaintiff should be entitled to assert at least the claim that was brought within the three years regarding the failure to reinstate related to his dismissal under the applicable federal statutes. For these reasons, the district court decision should be reversed. Thank you. Is your argument novel, or is this the first time that your argument has been presented to this court? The answer is yes and no. And the reason why I say that is the law is so obvious that I don't think it has ever been dismissed before in the federal courts. I am not aware of any decision before this saying that a dismissal related to some discriminatory factor. I'm not aware of any case that said, no, you have to start it within four months, because I don't think anyone has ever challenged it before because the law was so clear under the Cuarto case where it was clear it said there's a three-year statute that applies, period. How do you respond to your opposing counsel's citation in response to my question about one case that he believes is a strong support? Well, I'm familiar with the Dawson case. Regrettably, it was my case. The Itala case? I'm sorry? The Itala case? Oh, no. I thought you were referring to the Dawson case, or which one? Your honor? I think you may have mentioned the Itala case. Oh, the Itala case. Basically, they said, as I think was correctly pointed out, that they applied federal law to that case, in essence. They said, in order to have a due process claim, you have to basically exhaust your state remedies first. So it wasn't that they applied the state law. They applied the federal law of what due process means. And my understanding is, by applying the federal law, they said you don't have a due process claim because you have to go through an Article 78 proceeding. Thank you. Thank you. Thank you both for your arguments. The Court will reserve decision. Thank you. We'll hear the next case, Boniel versus Berryhill. Good morning, Your Honors, and may it please the Court, Spencer Durland for Appellant Kenneth Bonier. The Court should vacate the judgment below and remand for further administrative proceedings, because the ALJ, who denied Mr. Bonier's claim for disability insurance benefits, overlooked or ignored the only pre-DLI medical evaluation in the record, and also failed to develop and interpret that record in accordance with rules that were designed to ensure that inferences about disability onset have a legitimate medical basis. How would you respond to this, that if Mr. Bonier engaged in substantial gainful activity, both before and after his date last insured, that that means that under Step 1, he was not disabled at the time, regardless of what the medical reports show or what the medical consultant would say? That's true in the abstract. In other words, if a person is not disabled at Step 1, then there is no resort to Step 2. That's the end of the analysis. But that's certainly not a determination that this Court could make here, because there are no findings for the Court to rely upon. And the critical piece here is that determination at Step 1 is not limited to simply comparing a claimant's earnings to the earnings thresholds that are set out in the regulations. That's the start of the step, but it's by no means the end of it. And here, for example, the earnings that Mr. Bonier obtained from his work at the ticket delivery service, there is ample evidence in the record that he could rely upon to establish that those wages were earned under special conditions, and they would not then be counted against him at Step 1. On page 28 of the Commissioner's brief, she concedes that this is a Step 2 case. It's not a Step 1 case. And because of the Chenery Doctrine, because this Court's review is narrow in the sense that it's either giving a thumbs-up or a thumbs-down on what the agency did, there's no opportunity here for the Court to resort to other steps. That's the Melville v. Actful case. This Court does not resolve or does not address the steps in the first instance. That's for the ALJ to do. Really, the only question here is whether there is any evidence of a medically determinable impairment. It's not severity. That's what the ALJ determined. So at page 25 of the record, the ALJ says in the beginning of the Step 2 discussion, the ALJ says there are no medical findings or no medical signs or laboratory findings to substantiate an impairment. The entirety of her legal discussion is about the prerequisites to establishing an impairment. There's nothing about severity. On page 26, she says there is no evidence of a medically determinable impairment. She cites Dr. Marag for that proposition and concludes that Mr. Bonnier is not disabled under the regulations because there is inadequate evidence of a medically determinable impairment. That's the stated basis for the agency's determination, and that basis is indefensible for precisely the reason that the Court suggested in its order appointing counsel. Those school records and, in particular, the 1989 evaluations conducted by Drs. Safer and Blumenthal are objective medical evidence. They are in the record. Did he have a determination that he was not disabled prior to 2000 under the other provision? He applied for disability and lost, right, in a prior proceeding. He applied under Title 16 and Title 2. That's correct. And there was a finding at that point that he was not disabled during that period. Prior to 2000. The Title 2 claim is the only one that would be retroactive. But I'm looking now at the earlier determination that he wasn't disabled, I guess it was under Title 16, prior to 2000. Is that accurate? That's not accurate, Your Honor. What was the determination? The determination is that he was, under Title 16, he is disabled from May 2000, as of May 2009, the date of his application. So that application, that request was granted. Okay. Leave that aside. Okay. What was determined with respect to prior to 2000? The Title 2 determination was denied on the ground that there was insufficient evidence of a medically determinable impairment, the same ground that the ALJ relied upon. But you have to show an impairment prior to 2000 in order to recover here, right? That's correct. The DLI is, right, 12-31-99. So basically what you're saying is they didn't do enough of an investigation into that period? Well, what I'm saying is that... I guess I'm saying both. At the very least, the ALJ did not, either didn't consider or didn't adequately address the only pre-DLI medical evaluation that's in the record. And those two evaluations are critical, particularly because there was not any other evidence, any other pre-DLI evidence. All of those prison records from November 1993 to May of 1999 were not recovered. So the only medical... You did not obtain any of the records from prison, medical records from prison? None of those records were obtained. That's correct, Your Honor. You're putting it in a passive voice. It's the responsibility of the claimant here to get those records. It's also the responsibility of the ALJ. In other words, efforts were made to get the records, and they failed. That's correct, Your Honor. In our view, insufficient efforts were made. And you're absolutely right that it is a dual responsibility. Of course, the claimant has a responsibility to present any evidence that he or she has, to sit for consultative examinations, as Mr. Bonnier did, and to attempt to assist in the obtaining of the records. And, of course, Mr. Bonnier was represented, but this Court's precedent told that the ALJ's duty to develop the record does not wax and wane, depending on whether or not the claimant is represented by counsel. It is the ALJ's ultimate responsibility to develop the records that she needs in order to make a reasoned decision, one with substantial evidence. In the SSR 8320, my reading is that the counsel did not raise that SSR 83020 issue before the administrative law judge, and only did so before the district court. Is that correct? Yes, I think that's correct. But to the extent that Your Honor is implying that there's a waiver for failure to raise that argument, I would strenuously disagree, for much the same reason that I would disagree that it's Mr. Bonnier's fault that the medical records are not complete. Here, the nature of the administrative proceeding is entirely different from standard federal court litigation. It's an inquisitorial proceeding. The ALJ is not relying upon the parties to raise particular arguments or to flush out particular issues. Does it matter at all if that SSR 8320 has been apparently repealed and replaced with a new ruling that says that it's discretionary for the ALJ to call medical experts? No, it does not matter in two ways. First, it doesn't change the ALJ's obligation to apply 8320 at the time. In fact, the new ruling, 1801P, specifically says we expect federal courts to judge our decisions based on the rulings that were in place at the time. If we were to send it back for the ALJ to follow Rule 8320, it would be the amended rule that they would follow now. I mean, it would be the current rule, right? That's absolutely right, Your Honor, and that would not be a futile gesture because 1801P still requires the ALJ to at least exercise her discretion over whether or not to consult with a medical advisor. And here, the Commissioner has not even disputed our argument that the ALJ did not exercise her discretion in that respect. There was no discussion of that rule, no indication that the ALJ applied that rule at all. And in that respect, it's much like the Johnson case, where a court was presented with a situation in which it simply was not clear whether the ALJ had applied the treating physician rule. And so the court said we're not going to speculate about what the ALJ might have done had that rule been applied. Instead, we're going to send it back because this claimant is entitled to have her claim decided by the applicable legal principles. And of course, as you point out, the applicable legal principle will be 1801P and not 8320 now, but the new ruling is really not all that different. Yes, it changes must to discretionary, but the ALJ still has to exercise discretion. It still says that if a person is disabled, the ALJ must select an onset date, and it still recognizes that the onset date may very well predate the earliest medical record. And in order for an ALJ to determine that onset date, the 1801P says you should look at the nature of, among other things, the nature of the claimant's disease or injury. And it reconciled the fact that an onset date is required for you to prevail prior to the DLI. And at that time, there was a determination that disability had not been proved. Well, I guess what I would say in response to that, this is essentially the argument that the Commissioner has raised. My response would be that I think it would be entirely arbitrary to draw this distinction between, in one circumstance, if the state agency examiner says you are disabled now but you were not before, then there's no resort to 8320 at all, even though you have an established present disability, one that, in this case, the ALJ heartily endorsed. Whereas, in another case, if the- Are you asking to overturn the prior decision? No, it's a separate proceeding, I guess is what you're saying. And therefore, there could be a fresh investigation that might be in conflict with the earlier outcome, might determine that there was an onset date that predated 2000. That's right. Now, what I'm saying is the onset question arises when you have a claimant who is presently disabled. And then the question then becomes, okay, is that present disability, did that arise when that person was covered by disability insurance? Right. So what I'm saying is it doesn't make any sense to draw a distinction between a case where the ALJ herself finds the claimant presently disabled or a case like this one, where the state agency examiner finds the ALJ presently disabled. I'm sorry, the claimant presently disabled. And the ALJ says, yeah, I agree with that, but I don't see any medical evidence of, any object of medical evidence of an impairment. I just think that if the Court in particular looks at the 1989 evaluations in conjunction with the rest of the evidence, I see no way to conclude that Mr. Bonia had no impairment at all on or before the DLI. I understand that there are other questions about his claim. I'm not suggesting that this is a case where the Court should simply remand for the calculation of benefits. But those are factual matters, medical questions that need to be addressed in the first instance to the ALJ on remand. Thank you. Good morning, Your Honors. My name is Jolie Apicella from the United States Attorney's Office, Eastern District of New York, for the Commissioner. Just to address a few issues in the appellant's argument. Can I just ask you at the outset, let's say that for the sake of argument that we were to agree with you that the evidence suggested that Mr. Bonia was engaged in substantial gainful activity in 1989. And let's say for the sake of argument that we were to agree with you that he has not shown that his impairment was severe. The ALJ, as I understand what the ALJ did, was to base the ruling only on the finding that there was no impairment. If that's so, how can we rule on one of the alternative bases? In terms of how can you rule on the gainful? I think the answer to that is that she reached the decision that there was no disabling severity, not in a bubble, but looking at the only records that we have, so those 25 pages. And even in those 25 pages, we have glimpses of what he was doing at the time. It's not just pure medical records. He's being evaluated by a psychologist for the purpose of being in an IEP program. So they're evaluating him in terms of vocation and what he can do and what his interests are. But the ALJ didn't flatly say what you're just saying, right? No, and she doesn't have to under the law. She referred to the report. She can carefully consider it. There's no reason for us to determine that she did not carefully consider it because it's in her opinion. And there just isn't enough there. The records are not conclusive to support a medically determinable severe disability, as it must be. With respect to the ALJ's decision and the hearing, she said at the hearing, or the ALJ said at the hearing that she would look into subpoenaing records from the Rikers Island Infirmary. At least that was the drift of what she was saying, that the ALJ was saying that the ALJ was intending to do. Did that happen? I did not find an indication in the record that that did or did not happen.  But I know that in that same conversation, and I want to stress that during the hearing, he was represented by a very experienced Social Security Counsel, Christopher Bowes. And he said he was in the Rikers from 1993 to 1996. So that was the first place that he was incarcerated while he awaited sentencing. And Christopher Bowes said the records will follow him from institutions. So I will subpoena the last institution that he was at. And she had already subpoenaed the Chateau Gay Institution. And I think he made the promise that he would look into getting the records from the Lincoln Center, which I think was the Hathaway House. So again, it is a dual responsibility. It's a dual responsibility. It's a complete independent responsibility on the part of each person. It's not sort of you do half and I'll do half. I don't think there, you know, if he was assured that he was, you know, counsel, and ultimately it is his burden, so he has every reason to go out and find these records. She had an independent duty under the law, not just relying on counsel. I see what you mean. And I do think she had the duty, but I think if he is saying I will subpoena, I will bring these records to you, she can rely on that. I don't know why she couldn't or why she would have to do, you know, double the work, duplicate the efforts. What about Bear Hill and Lion Mountain? She was going to do Chateau Gay. There was Rikers. Then there's Bear Hill and Lion Mountain in the picture. He did send the subpoena to Lion Mountain. Sorry, he did? She did? She did. Yeah, the ALG did send a subpoena to Lion Mountain. I'll need to check about this Bear Hill. Are you saying they don't have an argument that there was an insufficient effort to obtain these records? No. I think she did fulfill her duty by sending those subpoenas, discussing it with counsel. So this conversation is happening in 2010, and they're talking about records from 1993 to 1999. And during that conversation in the transcript, nobody really seems like it's realistic to get these records. They're talking about how, you know, your name disappears under the website, and you can't even find the paper. Is there a retention policy in these institutions? That is, after a period of time, they don't have to be retained anymore just as a matter of ordinary administration? I don't know each institution's retention policy, but I have seen it as 10 years, which would make sense. When you talk about impairment, an impairment, as I understand it, is a psychological abnormality. And we know that Bonnier's IQ was borderline for retardation. You have Dr. Safer, who said that he expresses, that is, Bonnier expresses profound personality disturbance. You have Dr. Blumenthal, who says, and I quote, psychologicals were highly pathologic. Isn't that abnormal? It does not reflect normal, but that is not sufficient to be a severe, you know, medically determinable impairment. I think the IQ evidence is really inconclusive. It does reflect borderline intellectual functioning, but the regulations even recognize that persons with a lower IQ may hold a full-time job and not be disabled if their adaptive functioning is sufficiently intact. You would agree that de minimis abnormalities would count as an impairment? Yes, in combination, or if he's sufficiently impaired so that he, again, it's really intertwined in the fact of the working. And here we know that, you know, at the time of the IQ test, he was working on the weekend. In the year prior, he made, I think it was, yeah, in the next year, working as a longshoreman, he made $11,000, over $11,000. Is there any determination about when the onset date was of the disability that was found? No, she did not have to determine an onset date. Why not? I mean, the onset date could have been prior to 2000. For the Title XVI claim? It doesn't matter. The Title XVI is forward-looking, right? Right. Now, I'm talking about the Title II. She did not find an onset date because she did not find a sufficiently severe disability. But when was there no onset date? We don't even know when the onset date was. Because how can you find an onset date for a disability that doesn't exist? Well, at some point there was a disability, right? Right, but it was after the date last in charge. I'm asking you when the onset date was. I'm sorry, I didn't hear that. I'm asking you what the onset date was of the disability that was found. Well, the alleged onset date was May 17, 1993 when he had a car accident. That's what he claimed. That's what he claimed. But there was no finding one way or the other about an onset date after that. Right, and it's the government's position that we did not need to make a finding because we were looking for a disability before the date last insured. And at that period in time, there was no disability. Can I come to this question in a slightly different way? You agree, I gather, that the plaintiff is currently disabled, right? Yes. And that he suffers from severe psychological difficulties, including bipolar disorder, right? I know that there was not a finding based on the bipolar disorder, but that he has mental impairments that qualify as a disability. As a severe psychological difficulty. Correct, I agree. Okay. Now, the school records apparently indicate that he had possibly related mental health problems in high school, right? Possibly, I don't think they're as conclusive as that. Well, what were the records that the ALJ had regarding school period? Well, there are 25 pages of a triennial review that was done by a psychologist and a psychiatrist. During high school. During high school, during just like a three-month period, during the second half of 1989. It doesn't even follow him the full year, it doesn't do his first year of high school, it's just this 11th. How many pages? 25. A lot of pages. Among psychologists, I gather, they tend not to write very much. I hadn't heard that. Unless you subpoenaed it, right? It's a very famous principle of psychological and psychiatric practice. I understand. So, the school records definitely indicate that he had related mental health problems in high school. There's no doubt about that. I think he had issues in high school, and some of which are not... No, I'm not talking about issues, I'm talking about mental health problems. I don't think they're so conclusive on any mental health diagnosis. They mention anxiety, depression, I think those are common to 17-year-olds. The testing is not fully explained. We don't know if they use methods of testing that are still employed to this day. So, I guess what we're all getting at, in different ways, is trying to find out why the ALJ did not consult with a medical expert to determine when the disability likely manifested. The disability which we know, from which we know he suffers. He just didn't do it at all, right? The ALJ did not do that. He did not consult with a medical expert, aside from the state medical examiner, who did not have those records in front of her at the time, that is true. But she did not have an obligation to do so. And I think there just is not enough in those school records for her to say, this has been going on for the past 12 months, as it must. And I think especially when you consider that with the fact that he had been working on the weekends, and working the year after. Just looking at that time period, there is not a disability that continues for the 12-month period, based on the school records alone. Let's talk a little bit about these various records. Hospital records from 2009 include his psychiatric history, correct? Correct. He reported that psychiatric history. And this was before the ALJ. Right, and she considered it. And that includes his claim that in prison he was placed in a psychiatric unit and treated for bipolar disorder, right? That's his testimony. It's based on what he responded. It's not substantiated or corroborated by any objective evidence. What would you require? Well, the prison records would be helpful. Is there a finding of somehow his statement about his psychological history was not credible? Was there a finding to that effect? There is not a finding to that effect. There are contradictory statements in the record, and the standard is that the SSA cannot rely on the claimant's statements about their own symptoms. There needs to be objective measures, medical testing, et cetera. But we don't have that. We don't have that. Because maybe not enough of an effort was made. Subpoenas were sent to the institutions. They came back saying that we never had an inmate under this name, that the name is not pulling up. So I think an effort was made. I think it was a sufficient effort, and I think these records likely don't exist, and on remand you wouldn't get any farther. Thank you. Thank you, Your Honor. May it please the Court, just a few quick points in rebuttal. Every single argument that is made in contravention to Mr. Bonnier's argument here is an argument that is different from the argument that the ALJ made, from the rationale that the ALJ gave. The Court would have to contravene Johnson, Melville, Burgess, Colville, that entire line of cases in which the Court has maintained a very disciplined separation between this Court's role and the role of the ALJ for important separation of powers reasons, because of different institutional competencies, and so on. So every time that the Commissioner talks about earnings, or every time the Commissioner talks about severity, or talks about the durational requirement to establish disability, not one of those things is a basis that the ALJ gave for her determination. I understand the temptation to look beyond and try to predict how might this shake out, but it's really not this Court's function to do that. The Court needs to be specifically concerned with the impairment question. And Chief Judge Katzmann, you asked about de minimis impairments. Under this Court's Dixon decision, de minimis is the threshold between severe and non-severe. Severe sounds like it's very serious, but it's really not, as the Court has interpreted that regulation in order for it to be a valid implementation of the statute, it needs to screen out only de minimis claims or only de minimis impairments. Here, I don't see any reasonable argument that he did not have serious psychological problems, as Judge Cabranes pointed out. Highly pathologic testing, testing indicative of severe pathology, profound personality disturbance, borderline IQ, and on and on and on. So, with that respect, I urge the Court to concentrate its focus solely on the ALJ's determination. With respect to the subpoenas, yes, subpoenas were sent out. Yes, Mr. Bowes was enlisted to assist with gathering the records. But if it's not too much to ask the ALJ to send subpoenas, I would think that it's not too much to ask the ALJ to demand an adequate response. I mean, Sadegay said, we don't even know who this guy is. That's not good enough. I mean, the ALJ, her responsibility is to develop a record that she can use. What could she have done in those circumstances, presented by that kind of response from a relevant institution? I would expect her to follow up. And, in fact, the regulations state that. That's what I'm asking. How would you, quote, follow up, unquote? I would send a letter. I would resend a subpoena. I would get on the phone. And I think the same thing applies with respect to Mr. Bowes. Sure, it's perfectly reasonable, as Ms. Aposella pointed out, for her to delegate some of her responsibility to Mr. Bowes. He says, I'll do this. But I still think that she needs to follow up with him before she writes a decision saying, we don't have enough records. And that's particularly true in this case, given the disproportionate, well, not disproportionate, but the enormous weight that she placed on records during the DLI period. Ms. Aposella pointed out in part of her argument, the prison records would be helpful. They most certainly would be. And, in fact, during the first hearing, the ALJ said, I can't do anything without those records. Mr. Bonnier, I need those records. And yet she then wrote a decision denying his claim without doing all that much to follow up on her demands for those records. So, with respect to the bipolar disorder, 385 of the record, Dr. Marag, who's the psychological consultant, indicates his medical records substantiate a claim of bipolar disorder. And so to understand, if you are trying to figure out what is the onset of this man's disability, we know he has one, we know he has bipolar disorder, he reported, he wasn't reporting his symptoms. Could you finish up your thought? Certainly. So he doesn't merely report his symptoms, he's reporting a diagnosis that he received, and that diagnosis would be in the record had the prison records been secured. Thank you very much. Thank you. Thank you both for your good arguments. The Court will reserve decision. We'll hear the next case, United States v. De Silva, Houghton. May it please the Court, my name is Alan Nelson, and I represent the appellant O'Neill De Silva. We submit that the District Court, in conducting the Rule 11 plea proceedings, committed plain error. This Court has adopted a strict adherence standard to evaluate the acceptance of a guilty plea pursuant to Rule 11 requiring a critical examination of the defendant's medical records. Here, the District Court erred in two material matters. First, it failed to make a full and complete inquiry into appellant's mental status, and second, the Court failed to advise appellant that the sentencing guidelines were advisory, that in imposing sentence, the Court was required to review the factors articulated in 3553, and most significantly, it had the power to following review of those factors to vary above the advisory guideline range. The circumstances of the plea here were . . . Can I ask you to . . . looking at the record, it seems to me that the District Court did what you say the District Court didn't do. Actually, it did not. The District Court inquired about the mental facilities, about the medications, asked specifically whether your client understood what was going on. He said he did. He's counseled, raised no objection. Isn't that a problem? Well, actually, the problem here is the unique nature of the proceedings. The proceedings commenced with either this was going to be substitution of counsel or setting a trial date. But yet, in the middle of the proceedings, or rather quickly into it, two pages into the plea proceedings, to the surprise of all in the courtroom, the defendant elected to accept the plea offer that was being made. So it was an unusual circumstance to begin with. Second, with respect to my client's mental state, this was an unusual situation because Mr. DeSilva came into the courtroom in a wheelchair. He was nonambulatory. He was taking both antidepressant and anti-anxiety medication, as well as significant medication for purposes of the pain he was experiencing from the injuries to his spine. The court asked, and this is in the appendix, and the full discussion is 65 to 67. The court asked counsel, let me just ask either counsel if you have any doubts as to Mr. DeSilva's competency to plead at this time. To the government, no, Your Honor. Defense counsel, no, Your Honor. The court goes into extended discussion with the defendant about his medication uses. When you take this medication, does it affect your ability to understand what's going on around you? The defendant sometimes, yes. How about right now? Not right now, the defendant says. The court, you're able to communicate with your lawyer even when you're on the medication? Yes, ma'am. I believe the response to that, Your Honor, is clear. First, counsel stated at page A66 of the appendix that he did not know the type, dosage, or full panoply of medication Mr. DeSilva received. He couldn't tell the court what it was. The court didn't know what it was. His client with an IQ that was diagnosed by Dr. Drogue as being borderline level 76 and being diagnosed with both anxiety disorder, emotional disorder, inability to be able to concurrently speak at the appropriate time, these were the kind of things that to rely upon what the attorney not knowing what the medication was or the court being in a position to know what was taking place with a person who was objectively ill and had a prior existing anxiety and depression issue mandated that there be a much further inquiry, particularly under the unique circumstances here, where the individual comes into the courtroom in a wheelchair about to seek new counsel and instead decides in the middle of the proceedings that he wants to enter a guilty plea, resulting in an adjournment so counsel could speak to him further about whether that's in fact what he wishes to do. The court was on notice at that point to really make a detailed inquiry. And it actually didn't. It relied upon the defendant's statements and the counsel's statements, which were just based on his objective observations. Mr. Nelson, when did you enter this case? I entered the case subsequent to, I believe it was in August of this past year. Meaning where in the timeline? Oh, I was substituted as TJA counsel after the defendant indicated that he no longer had confidence in his district court counsel. And that's when I reviewed the record concerning the events that took place. What is it that you want from us? That is, what's the decree that if you could fashion it yourself that we should enter? We're asking the court to enter an order in this case reversing or vacating the conviction in the case and remanding the matter for further proceedings. He could then make an intelligent decision because Mr. DeSilva now is in Denver. He's receiving extensive treatment both psychologically and physically that would place him in a position to be able to make a complete and informed election as to what he would like to do. At what point did he raise the issue that his plea was improper or involuntary? After the application, I would say it was approximately two weeks after the sentence was imposed by the court. Counsel met with the defendant in the MCC before he was designated. And at that time he indicated he no longer had confidence in counsel. And he wanted new counsel to be able to handle the appeal of the matter, which is in this particular instance significant because just as a matter of fact, he received a sentence that was above the guidelines, correct? Yes, yes. And that was a surprise to him. Yes. In fact, it's rather unique here because the guidelines here weren't really guidelines. It was a sentence of 120 months. As a result of that, there was an unusual circumstance, and particularly if you look at the record, in that the parties all agreed that nobody would move for either a departure or an upward or a downward variance. In addition, counsel advised the defense to respond to it by the court. Yes. And didn't the district court say on a number of occasions that it would not be bound? Actually, a close review of the record indicates what the district court continues to speak in terms of is the guideline determination. It does not discuss in any detail the fact that the 3553 factors have to be reviewed. It does not discuss in detail that it has the power after reviewing them. I understood that the court said that it would determine the appropriate sentence and that the sentence could be different from what the parties had thought it might be. Absolutely, Your Honor. However, it's stated in the context of an evaluation of the guidelines, not in the context of a discussion as to whether or not the court's sua sponte would be able to vary upward up to what the maximum potential sentence would be. How long was the sentencing? What was the period after the conviction between the conviction and the sentencing? I believe it was five months. Five months, of course. He could have tried to have his plea changed or moved to have his plea vacated. The vast majority of that time. He didn't do that. He waited until he was sentenced and he got the 180 months. That's correct. Well, I'm well aware of the fact that the court was able to do that. Well, I'm well aware of the fact that there was a significant period of time that elapsed between the plea and the sentence. Certainly, the appellant here, given his mental state and physical condition, was not reviewing the minutes of the proceeding to determine whether or not it was effectively done. More significantly, he had been advised by his counsel, the guidelines are going to be 120 months. Everybody understands it's 120 months. Nobody's moving for an upward or downward variance here. The probation department recommended a 120-month sentence, so the only document he had actually seen in between was the PSR in the case. So he had no reason to think in any other terms. He was comfortable with everything, and he got a sentence of 120 months. Absent the court having advised him of the fact at the time that the plea was entered that the guidelines were only advisory, that the court was required to review the 3553 factors, and that it had the ability and the power to vary upward. That was never stated to him. And but for the fact that those things were not stated to him at the time of the plea. When he woke up after he received the sentence, that's when he said, you know, wait a minute, my plea was improper. And prior to that, there was no concern. Well, at that time, he no longer expressed confidence in his counsel and requested a new counsel. And at that time, the review was conducted of the plea. I have no doubt that he was upset. And in fact, he relied on his plea, did he not, in his sentencing submission as evidence of his remorse and maturity. He did, in fact. That was submitted months after the plea was entered. And that was as a result of the fact that counsel thought it was very important for the court to be able to see the report of Dr. Drobe, the forensic psychiatrist, which reflected the fact that the appellant had a 76 IQ and had significant psychological issues for the court to consider, which are factors that certainly should have been taken into account at the time the plea itself came into play. My final argument being, in substance and summary, that in looking at plain error review, there is a clear error here if you look closely at the requirements that this Court has imposed under Laura for a very strict scrutiny of what takes place in district court. And that's not done in a vacuum. It's not just done on the record. It's who's coming into court, what's taking place. Every single plea is unique in and of itself. Every single one is sua sponte. And that's the reason why. And it was sui generis, rather. And that's why in every single one of the proceedings, the court is required to follow very strictly the rules under Rule 11. And here, very simply, the court did not do so. It seems to me, reviewing this transcript, that Judge Nathan probably has a so-called checklist. By now, just about every district judge in the country has a checklist of things to raise in a change-of-plea proceeding. What is it that she didn't have on her checklist? What should she have added? What is it that you would want her to do if we send this case back to her? I would say in the approximate 20 years to the 30 years now that I've been on the CJA panel and probably taken about since post-Booker, 200 pleas, a portion of the colloquy that she did not include, that I think should be included at all times, are the three things that I raised. One, that the guidelines are not mandatory. Two, I must review the 3553 factors. And they are one through six and where they fall into play. And I have the power to vary upwardly or downwardly based upon that. Those are the three things. And none of those three items or matters were part of this record at any time? Completely devoid. While the government is certainly going to get up and say it's in the plea agreement, given the nature of the individual that's involved— It's kind of important, isn't it? Well, it's important. However, we don't know what it was that was discussed between counsel— Well, did she ask questions about what he knew about the plea agreement? Or had he read the plea agreement? Had he signed the plea agreement? She did that, right? She did. But the difference here is he came into the courtroom not anticipating the plea gilting. And somewhere along the line in the courtroom, that changed. So that negates what took place. Well, I'm not sure about that. Was the plea agreement reduced to writing? Of course it was. Yes. Was the plea agreement submitted or conveyed to the defendant? My understandings are that they were. Was there a statement in open court by counsel and or the defendant that he had read the plea agreement? Yes. That he understood the plea agreement? Yes. Again, though, that gets to the question of the Rule 11 proceedings themselves. Under Laura requires a very strict scrutiny of the actual proceedings themselves and to look very closely as to whether or not there are any deficiencies in the pleading in the courtroom itself. And those are the reasons why I ask that the court consider, in its decision in this case, setting forth for further use on plea provisions. And at the time that Rule 11 proceedings take place, that the specific questions that you would ask be included in that plea colloquy. Thank you. Good morning, and may it please the Court. My name is Hagan Scotten. I'm an assistant United States attorney in the Southern District of New York. I represent the government here, and I also represent the government in the court below. Because the district court fully complied with Rule 11, and because the defendant's plea was knowing and voluntary, the judgment should be affirmed. I'll start briefly on the medical issue. I think largely for the reasons reflected in the colloquy, there was a full discussion of any medical issues and any issues with medication. The court didn't ask what type of medication it didn't talk about in any specific way about the medication itself. Should it have? I don't think that's necessary, Your Honor. And, in fact, in the cases cited by my adversary, for example, in Tien and Rosello, what the court says is the district court needs to inquire as to the effects on the person as to his ability to understand. The inquiry is, do you know what's going on, not a catalog of medications. Here, I think, in fact, the inquiry was one better, although neither the district court nor the defense attorney knew specifically what medications were being taken. And on page 66 of the appendix, you can see the defense attorney had actually spoken with the defendant's treating physician and was able to give the district court assurances both as to the medications effect and as to the fact that the defendant, although suffering from depression and anxiety, wasn't suffering from some more serious mental illness that would really cause perception problems. So, you know, having a defense attorney recite medicine names doesn't add anything because neither courts nor lawyers or medical experts. I think it's actually far better here for the attorney to say, I spoke with his doctor. I have no concerns about his ability to perceive based on consulting with somebody who is a medical professional. So I think here the inquiry was entirely sufficient. Moving on briefly to the guidelines issue, just to sort of walk through that, I think the district court did say essentially all of the things that Mr. Nelson suggested should have. Starting at page 73 of the appendix, the district court says, by pleading guilty, you are exposing yourself to the possibility of receiving any combination of punishments up to the maximum that I'm about to describe. Six lines later, the district court says, the maximum term of imprisonment for count four, the county was pleading guilty to, is life. Do you understand that? Yes. Then moving on four pages to page 77, the district court reads Rule 11B1M almost verbatim, makes it a little more colloquial, to include a specific reference to saying, in which the district court said, she would determine a reasonable sentence for you based on the sentencing factors contained in a statute called 18 United States Code Section 3553A. Do you understand all that? To which the defendant replied, yes, ma'am. I don't see how that could be plain error. Then continuing on that same page, and I think Your Honor referred to this, the district court judge says both that nobody can predict your sentence, and you may be surprised by it, only I'm going to determine your sentence, and further cautions the defendant, similar to Your Honor's inquiry, that you cannot withdraw your plea if you don't like your sentence. So he's clearly been told, you are not guaranteed a 121 sentence. You can get anything up to life, and you won't be able to withdraw that. That's a real possibility. Finally. What about your adversary's view in response to Judge Cabranes' questioning, that with respect to the Section 3553A factors, that there needed to be more discussion, more detail as to each of those factors? I don't believe that's a requirement. It's not in the rule. I'm not going to speak from experience. But I certainly, this is the checklist that judges use again and again, and I think it's permissible, as Judge Nathan did, to say, look, have you discussed this with your attorney? Have you gone over these factors in detail with your attorney? There certainly is room for an attorney to explain things. And then to finish up, consistent with Judge Cabranes' inquiry, at page 79 of the appendix, you see that the district court did indeed ask, have you read the plea agreement? Have you reviewed it with your attorney? Do you understand it? And that is important because the plea agreement also says that the office is not promising any sentence and that the defendant is exposing himself to anything up to life imprisonment. The final point I wanted to make, Your Honors, I don't think it is a distinguishing fact that would make this case unique had Mr. De Silva chosen to plead guilty on the day of. In the time before plea agreements were often reduced to writing, day of pleas were not uncommon, and this Court affirmed many of them. Here, however, this appearance was scheduled as a change of plea hearing a week in advance. The plea agreement, as Judge Cabranes asked, was reduced to writing, and you can see the date on it, is a day in advance. So this is not a spontaneous decision to plead guilty. It is true that on the day of, apparently Mr. De Silva had a second thought. The government filed a quick letter to Judge Nathan and said, do you want to postpone this? But when Mr. De Silva showed up in court and had a chance to speak with his lawyer, he said, you know, I want to go forward with this plea I scheduled last week. It was reduced to writing yesterday. So this is not a spontaneous or last-minute decision, not that I think it would matter if it was. I'll rest on my briefs for the remainder of my points. Thank you, Your Honor. In rather brief response to the government's position, this case was indeed sui generis because of procedural history. He had requested new counsel. He then stayed with counsel. He then requested new counsel again. He didn't want his plea. He won his plea. He didn't want his plea. He won his plea. He's of diminished capacity while the government points to the fact that questions were raised concerning medication and that the attorney indicated that he spoke with the doctor concerning his mental ability. The attorney very clearly states at page 866 that I do not know the specific dosages or types of medication or the panoply of all of the medications that he's taking. And that's why I think they have a medical expert come in whenever there are medical experts involved in a plea agreement. In very few, but maybe in the case of this nature. In very few. And in this case, what difference would it have made if it was 40 milligrams or 60 milligrams in terms of the outcome? Because the main question here is can you understand what's going on at the time? Nobody in the room would be capable of saying, oh, my gosh, it's 60 milligrams. That causes a person to be unable to function. So what difference would it have made just knowing either the name of the medication or the dosage? It's not the name of the dosage, it's the combination of them. It's not the name of the dosage. If you're taking antidepressant medication, anti-anxiety medication, and significant pain medication at the same time. Everybody knew that. Everybody knew that fact. And they relied upon counsel's statement that this is fine. And the defendant who has changed his mind three times in the last four days, I understand very clearly that it is, and it's our position, that under the circumstances here where the court failed to articulate the 3553 factors, indeed the very 3553 factors that the court then relied upon for purposes of enhancing his sentence, had that been done, then there was a reasonable probability that the defendant would have really thought closely about what he was doing. But that wasn't stated. Rather what was stated, and I'm going to look at the 33 factors as well. Thank you. Thank you. Thank you both for your arguments. The court will reserve decision. We'll hear the next case. Mr. Benjamin. May it please the Court. Good morning. My name is Drew Toshloff. I'm the attorney for the appellant Alexander Benjamin. This is the second appeal in this matter, which is an action under the Fair Debt Collection Practice Act, or the FDCPA. It was dismissed earlier on the statute of limitations grounds. The statute of limitations for the FDCPA holds that the action should be brought forward within a year of the occurrence of the violation. In the original case, the district court found that the occurrence of the violation was when the restraining notice, which was the basis of this action, was transmitted from the debt collector to the plaintiff's bank. On appeal, the second circuit reversed and said no, the occurrence was when the bank froze the account because at that time there were two things that were satisfied. First, that there was a complete cause of action, and second, that the plaintiff had notice of the cause of action, the violation of the FDCPA. There might be an argument that you have the statute to be told until he learned of the problem. Of the actual violation of the FDCPA. His accounts were frozen. But all of that occurred on the 13th, December 13th. What happened actually on remand was it was found that Citibank placed a block on the account, is what their internal term is, which blocked access through an ATM and through an online access to the accounts. That was in the evening of the 13th. And the plaintiff then called the bank, what's going on here, tried to find out what was happening, and the bank said we don't know, you have to call this number tomorrow. The next morning he called the bank, that was the 14th, the bank told him. They told him the details the next day. He knew his accounts were frozen at that point. That's correct. Lawfully or not, he didn't know whether it was justifiable or not. To the point that he thought he might be having a heart attack. Yes, he was very distressed. Very distressed on the 13th. Absolutely. He experienced injury on the 13th. And he had contacted his lawyer on the 13th. Yes, he called me, yes. I'm also a personal friend. But he called me and we both knew nothing, basically. He seemed to be of the mind that this was a legitimate thing. He didn't know what it was exactly. He experienced this on an earlier occasion. That's correct. He was concerned about this. There's certainly a reason to inquire, but there was no reason to believe that this had been done improperly. To suspect, but not to believe that it had been done. We didn't have any information to bring a lawsuit on that date. We didn't have any capability of... But he knew enough on December 13th to begin the inquiry. Yes. He contacted you. He contacted me. He asked what we think we should do. Maybe it would be something legal. Even if it was justifiable action against him, it's something where you need a lawyer to negotiate. How long did the case last? It was two days, right? I think it was... The actual imposition of all the sequestering actually was the next day, the 14th. It was filed on the 14th. That's what all the documents say, December 14th. It was lifted on the 15th. I think it was the 15th that it actually was lifted, yeah. And the actual service of the restraining notice on us was even later. It was mailed by Citibank on the 14th. So, anyway, there was no... We did not have actual knowledge of the facts that served as a basis of an FDCPA action on the 13th. We only got that on the 14th. Right. That's not the question. The question is were you on inquiry notice as of that date for purposes of the statute of limitations? Well, if we have inquiry notice, then we have to be diligent, and we were duly diligent. And the next day, as soon as we could, we got the information. So that we actually... So your argument is that that's what... The statute didn't begin to run until that, until the next day. That's correct. That's our understanding of what the original holding was in the first Benson case. And that requirement that we be aware of the FDCPA violation was actually echoed in another case, against also the same defendants here, McCrovey v. Palisades, which says that the occurrence does not occur until, first, the cause of action is complete, including injury, and, second, there's actually notice of the FDCPA violation. I wonder if part of the concern here is that, on the one hand, in the opinion itself, Benjamin 1, let's say, it plainly states that an FDCPA violation does not occur for the purposes of Section 1692KD until the brank freezes the debtor's account. And that says nothing about notice. But I wonder if the confusion may be that, in another part of the opinion, it says the FDCPA violation here did not occur until Citibank froze Benjamin's account because it was only then that he had a complete cause of action and notice of the FDCPA violation. And so that leads to your argument that we also have the very clear statement by the Court— I think it can be understood to say that it could not have occurred prior to the actual— freezing the account because that's the injury. That's the final element of the cause of action. But we didn't have all the knowledge of the cause of action. The cause of the cause of action is the thing we need to find out. And then I think if we just follow Benjamin 1 as it's fully read, I think, as maybe you're appreciating, we have also the judge addressed the discovery rule, which is kind of an interesting area. There's a split in the circuits. It was recently changed on the Third Circuit of Rotisky. It now has been—Cert has been granted for that in February, so it's going to the Supreme Court. The issue on the discovery rule, though, was that the judge, again, applied the wrong rule. She said that discovery—the discovery rule applies to start only when you become aware of the injury. And that's not the right interpretation or expression of the rule. The discovery rule applies to hold the start of the limitations period until the plaintiff has the facts which form the basis of the cause of action. That's the general express rule. On some situations, finding out the injury is the—you know, you get to the last thing, and then you have the entire cause of action, and those are some cases. And there also were some cases that were cited which have a different discovery rule for a special situation, like under RICO, which is a kind of complicated thing, which has not just damage, but because RICO has two predicate acts, it's a very weird, you know, time frame, two predicate criminal acts for the criminal enterprise. And, of course, this is all mentioned in our briefing. Thank you. Good morning. May it please the Court. Rob Berkson for Hauslanger & Associates and Todd Hauslanger. Your Honors, when this Court remanded this case to the District Court, it did so for two reasons. First, to determine when Citibank froze the account. And second, if it was determined that the account was frozen on December 13, 2011, whether or not the discovery rule applied and gave life to this action. With respect to the first point of remand, it is now crystal clear, after having subpoenaed the operation manager for Citibank and deposed her, and she stated unequivocally, and this is in the record, that the account was frozen on December 13, 2011. In addition, we have a declaration from the appellant, which he states that he knew on December 13, 2011, that his account had been frozen. How did he know? His wife told him. He had heart palpitations. He tried to access the account. He couldn't do so. He contacted his counsel two or three times that very day, and he knew that there was a legal issue here that he had to attend to. But yet he didn't do so, and the claim wasn't filed until after the statute of limitations had run. So there is no dispute here, really. The record is crystal clear that the freeze occurred on December 13, 2011. The case was commenced not until December 14, 2012. Putting his argument in the best light, I think, is that he didn't have all the details that he would want to put in a complaint as of the 13th. I understand that is his point, and the way I read it, Your Honor, is he's basically saying, I need to know who to sue, but that's not the law. That's not the law in the circuit, and that's not the law, as far as I'm aware, anywhere. He knew that he was injured on the 13th, and that starts the clock. He had the facts upon which a suit could be based, even though he didn't know the details of who the defendant might be. That's right. That's right. And the record is also clear that this is not the first time that this had happened. It had happened before, and the appellant concedes that. His counsel concedes that. So they knew on the 13th that there was a potential claimant. Was there a matter of knowledge, generally, that Andrew and Alexander had these confused records at the bank on the Social Security numbers, etc.? Yeah, and apparently the brother was using Mr. Benjamin in this case, his Social Security number, and that's how there was a false restraint of his account. Is that true the first time? I believe so, yes. And it did, unfortunately, happen again. As Your Honor pointed out, as soon as it was brought to my client's attention, he directed Citibank to remove the restraint, and it was done. And the contact was made with my client, I believe, on the 14th. And my client then immediately contacted Citibank, and Citibank removed the restraint. So this was, you know, clearly a mistake. But the time to move under the FDCPA for a claim based on that mistake was time barred because they waited too long. In terms of the discovery rule, there really is no issue regarding the discovery rule. The court doesn't need to decide it, as Judge Buckle said below, because the knowledge of the freeze and the freeze itself occurred on the same day. There's no daylight between the two. So the discovery rule doesn't come into play because the plaintiff discovered it on the same day that it was frozen. So your view is that it's not necessary for us to decide the case? It's not necessary for us to wait for the Supreme Court's decision in Brodsky? Well, that addresses a broader issue, Your Honor, because in that case, if it's decided differently than this Court decided in Benjamin II, it could potentially undo the whole thing because there, I believe it's a Third Circuit case where the Third Circuit said that the statute of limitations starts to run at the last point in time when the debt collector undertook to do the act that allegedly violated the statute. So yes, I mean, there is a potential that this whole thing will unwind if the Supreme Court agrees with the Third Circuit. Unless the Court has any questions, I'll rest on my papers. Thank you. Thank you. Your Honor observed that we didn't have all the details of the cause of action. That's actually, you're leaving out, like, the entire cause of action. The FPCPA penalizes the use of a false document, which is — That's what's required on doing — it's trying to point out the differences between your position and your adversary's position. Well, to characterize the elements of the cause of action as details is a little bit — well, I guess maybe I understand you're trying to spin it a little bit. I mean, that's very different from saying you're on inquiry notice that the account was frozen. Sure. I think on inquiry notice, that doesn't start the period. Inquiry notice starts your period of diligence, and then you have to take action when you learn having been diligent, and that was the next step. For statute of limitations purposes, it seems to me that the harm, once you're aware of the harm, then you have — you're aware, and you quoted language to that effect — Sure. — that you're aware of the facts that make out the cause of action. You don't know who the defendant is. You don't know the statute, maybe, although here it's pretty close to knowing that. But you do know that the harm has occurred. But the underlying wrongfulness of it — I mean, I would assume that most of the time, if your bank account is frozen, it's legitimate, I hope. I mean, it's not just an FDCPA violation every time. The fact that it happened once in the past doesn't mean that my client would have known for sure. And, in fact, I think the court assumed that my client would have guessed it was the same thing because he had no legal possible seizure of his account. But that's not a record. And, in fact, there's plenty of things. He could have a tax lien put on his account. It could have been a bunch of different things that we didn't know what it was about. And the other thing is this issue of who to sue was raised as sort of a red herring by the court. It points out that you can file a John Doe action against a joint tort fee without knowing who it is, and that doesn't toll the statute of limitations. But that begs the question. That means you know there's a tort. If you know there's a tort, then you can name a John Doe defendant. But you can't go in and file an action against a John Doe defendant for some unspecified tort based just on an injury. That's insufficient information. Thank you. Thank you both for your arguments. The court will reserve decision. We'll now hear Sheeran versus Structured Asset Sales. Make sure it's still morning. Good morning. May it please the court. My name is Hillel Parness. I represent the Appellant Movement Structured Asset Sales. I wanted to briefly make two points at the outset to make sure that the court has them in mind. One is procedural, and the other is substantive slash practical. The procedural one is in full view at pages 66 and 62 of the record. At page 66, then District Judge Sullivan's rules appear, and they make very clear when one wants to make a motion what steps one has to follow and what one is not allowed to do. No party shall submit a reply letter. Affidavits and exhibits are not permitted in connection with pre-motion letters without prior written request and permission. I was a non-party seeking to intervene, and I put in a pre-motion letter. I followed up with the court by calling a few times. I was told no other papers should be put in by me. There were papers put in by — there were letters put in by the other parties. The parties were already in the case. I was told do not put in any more letters. If the judge wants an oral argument, the judge will let you know. And I think it was about a month after I first made contact with the court that the judge issued his decision. And on page 62, there is language there that was particularly striking to me. It says, indeed, SAS does not deny such knowledge and yet offers no explanation for its delay in filing this motion to intervene nearly two years after the original complaint was filed. And that struck me because I was given no opportunity to respond to anything that was put in in those other letters after I — Let's say, arguendo, we were to agree with you that there were these various procedural concerns. We can affirm, can we not, on grounds the district court did not rely upon review of the record. Isn't that correct? If I understand Your Honor's question, you can affirm that as a substantive matter, the court found my motion untimely and therefore I'm not allowed to intervene. Is that your question? Yes, absolutely. And I'd like to get to that point. So here, if you could help me understand this, the record reflects, it seems to me, that SAS had constructive notice of Griffin II when it was filed in July of 2017. Griffin I, after all, had a lot of media coverage, which would establish constructive notice of that action. And you don't genuinely dispute that you had actual notice of Griffin I when it was filed. And so notice of Griffin I, in turn, gives rise to constructive notice of Griffin II since the actions asserted the same claims against the defendants and were related. Well, let me respectfully challenge that, Your Honor. First of all, there's nothing in the record that says we had notice of Griffin II being filed. And in fact, were we allowed to proffer, we would say we did not actually know that Griffin II was filed. The news articles that are referenced in opposing counsel's letter to then-District Judge Sullivan were about the first case. So I do not think that the fact that there had been a first case that we knew, we conceded, we knew it was filed, and we knew it had been voluntarily dismissed, doesn't put us on notice that a second case was filed sometime later, I don't think. You were aware of the second suit since at least late 2017. By the time, no, we would proffer, and we put this in a reply brief, but again, there was no opportunity to proffer to this. We did not learn about it until late 2017, that there had even been a second suit. And at that point, I was not involved yet, but when one looks at the docket from that time period, the docket showed that the case had gone to mediation or was being sent to mediation, that it did not appear there was anything active going on from the docket. I personally did not get involved until 2018. I know that's not the issue here, but just from my own perspective, once we did get involved, we saw what we were able to see from the docket. We did not have access to the expert reports. We didn't know what was in them or what had been argued in them. So from a timeliness standpoint, we believe we were not untimely as such. In addition, we think that the timeliness has to be looked at in the context not of, it was mentioned that we knew we had a claim. Well, certainly, we knew we had the percentage ownership of the song from the beginning. So that is something we, of course, concede. But in terms of knowing that we had a case into which to intervene, I think is the key question. They would argue, if the two years knowing about our claim is the standard, they would have argued that if we tried to intervene on day one of the second case, it also would have been untimely. I don't think that's the case. That would be a different set of facts. It would be a different set of facts, absolutely. Could I ask you to help me understand how the denial of intervention prejudices you? Here, SAS's interests and Townsend's interests seem to be aligned. And no one disputes the others alleged shares of Townsend's share of Let's Get It On. Isn't that correct? Well, that's correct. They're aligned in the sense that we both claim the same act of infringement. And we own different pieces of the infringed work. However, there are differences in the approach that the other plaintiffs have taken in their case that are on full display. In fact, in a different context last week, opposing counsel said the only thing these two cases have in common is the alleged infringement. There's a very different strategy being taken by plaintiff's counsel in the first case. And we do believe, even if it would not be collateral estoppel, and we don't believe it would be, but determinations in the first case are going to affect us as co-owners of the work, as just a practical matter, especially in the same court in front of the same judge. I point to the Lareau case from this court in 2016. The prejudice, within the timeliness factor, the prejudice is not about the impact that I'm going to have on the first case, that it will make the first case more difficult to litigate or more complicated to litigate. The question is, and this court said it in Lareau, it's about did my delay, my delay to intervene in the second case, did my delay prejudice them? And back when I tried to intervene, they made the point that they were closing out discovery, they were moving for summary, they wanted to move for summary judgment, and if I were allowed to intervene, it would throw the summary judgment off the rails. My intervention motion was denied. They moved for summary judgment. I believe it was still District Judge Sullivan at the time. Judge Stanton then ruled on it, and he denied summary judgment of non-infringement across the board, saying that the jury needs to address this, the jury needs to understand the two works, the jury needs to decide substantial similarity. There is nothing that my new facts that I would bring into the case, and I'll get to a very limited request as to what I would be allowed to do, but that my additional evidence that I would bring to the first case is not going to make their summary judgment posture better. The court has already found there are questions of fact that need to be decided, but material questions of fact that need to be decided by the jury. Therefore, were I to intervene, it would not have impacted that summary judgment motion in a way that would have let them prevail on summary judgment. They're now past that summary judgment motion. I can't imagine them making another one. Going back to our very first letter, our only letter to Judge Sullivan, we had said we wanted to intervene, but we wanted to do it as quickly as possible, and with very limited additional discovery. Specifically, we were going to take the fact discovery that had already been conducted, we were going to take the parties as we found them, and we were going to, we wanted to put in our own expert reports as to the music issues, and an expert report on damages, because plaintiffs in that case had strategically decided not to put in an expert report on damages. That was our ask. And we said that we could get our expert reports out very quickly. We put specific timelines in the letter. Judge Sullivan used his discretion and denied those. But again, looking back at the prejudice that they would have felt, it would not have affected their summary judgment motion. It didn't, because they've already made it. As far as the prejudice to me, the prejudice to me and to my client is there's going to be this other case following a strategy that we do not agree with, proceeding ahead of us, that is absolutely going to have ramifications in the mind of the very judge who's sitting on both cases, at a minimum, about the merits of the case. And we wanted the full opportunity to do that. We do think that the court should not at this point send it back for a full determination. In the Richardson-Greenshields case that I cited from the circuit, it's a little bit older than the others. In that case, they said that the district judge had usurped the power by effectively not allowing an effective motion to be made. And at that point, they said to send it back and have the motion be made would be wholly artificial at that point. We're in the same posture here. The bell can't be unrung. It's too late. But if we were, we still, to this day, even though we have a second case proceeding, our preference is to be in the first case, to have intervened in the first case with the additional discovery we asked for and to move forward to a trial. So explain exactly what you want from us. What is it that you, as I said in an earlier case, what's the decreto language? I'll do my best. We would like the district court's decision deeming our motion made and denying it vacated with instruction that we be allowed to intervene in the case. And? And to allow us to take the limited additional discovery that we asked for, which is the case is ready for trial apparently, right? This case is ready for trial, but it is not scheduled for trial until September. We ask for, we're going to put in our expert reports on the music, which are ready. Our expert reports on discovery, we need to, on damages, excuse me, we need to receive the damages discovery to run that report. But we are committed to doing it as quickly as possible. You're effectively, though, asking to reopen the fact and expert discovery in the case. We are not asking to reopen fact. We are asking to reopen expert. Thank you. Thank you. We're right on the brink of good morning and good afternoon. May it please the court. My name is Eileen Sarkis. I'm from Prior Cashman and represent the appellees. Sony ACV Music Publishing, Ed Sheeran, and Atlantic Records. The key issue on this appeal is whether the district court abused its discretion in denying intervention on a case that was first filed in 2016. The appellants do not take issue with the fact that they've known about the first case since 2016. They just seem to want to selectively choose what publicly filed events on the docket they knew about and which ones they didn't know about. But that is why courts in this circuit don't look at the subjective knowledge and subjective awareness of the proposed intervener. When the first case was dismissed or withdrawn, there was nothing to intervene in. So now we're talking about the second case. And when was he on notice for that one? Sure, but the first case did put them on constructive and actual notice as they admit that a claim had been brought. They then admit that they... No longer in court. Sure, but then they admit that they knew about a second case being filed at least by the end of 2017. I would propose that they were on constructive notice that the second claim had been brought as well given that they can't learn about a claim, know who the plaintiffs are, and then play ostrich and just say, well, how am I supposed to know? There's ample opportunity for them to know by a simple Google search or a Pacer search. But even if we were to just put them on constructive notice or even take them at their word, which we're not required to do, that they found out about Griffin II in late 2017, by that point the case management plan had already been filed. It was a publicly filed document. That case management plan provided for an unusually early stipulated exchange of expert musicologist reports. And I want to take a moment to explain how important that is in this case. This isn't like, you know, damages expert reports that are just, you know, usually at the end of a case under the federal rules where you're arguing about the calculation of damages. These are expert musicologist reports that go to arguably the key issue in this copyright infringement case. It is there, it is the plaintiff's expert identifying, analyzing the two songs at issue, identifying what that expert believes are musical similarities between the two works, and dealing with the issues about whether those alleged similarities are original to the plaintiff's song. That is a key evidentiary issue. That is a key expert report that frames the case and frames fact discovery in the case. And because of that, the plaintiffs in the Griffin 2 case agreed to an early exchange. In fact, it was really the first thing that we did in this case to frame the issues. So under the publicly filed case management plan, the plaintiffs served their expert report in December 2017. My clients served their expert reports timely in January 2018. So by January 2018, based on a case that they admit that they had knowledge about, the experts had framed the issues, expert reports were closed because the parties did agree that no rebuttal expert reports would be provided by the plaintiffs. And the parties also agreed that all fact discovery would conclude a few months later by March 2018, and that any other expert reports, whether it's damages or otherwise, plaintiffs would serve by April 2018, and summary judgment pre-motion letters would be by June 2018. This plan was a matter of record on the docket? Absolutely. As of? As of October 2017. October. And in fact, it's in the record before this Court as well. What's the view of other counsel on this question? Of the Griffin Plaintiffs' Counsel? Well, they're happy to have them intervene now because they realize that they see this as an opportunity to get an expert rebuttal report after discovery is closed, after all the depositions have been had, including expert depositions. And what's the prejudice exactly, other than arguable inconvenience to you? Well, and just so I can finish answering your question, it's not only reopening expert discovery upon which all discovery was had, it's also reopening fact discovery because the SAS appellant seeks to seek entirely new categories of damages on touring, on merchandise, things that the Griffin Plaintiffs did not seek. And it's not simply a matter of just engaging in discovery. There would be motions undoubtedly directed towards both the damages that they seek, because we do not believe that a plaintiff is entitled to seek touring revenue or merchandising revenue if it's way too attenuated. There is the prejudice that could come our way should the Court allow that to proceed and to allow the jury to hear factual issues that were never supposed to be before the Court. And it's that we would have to be re-litigating essentially, potentially, the entire case, because we don't know what their expert's going to say, because despite the fact that his client has told us since August 2016 that he has an expert report ready to go for two years before he sought to intervene, we have yet to see it. So we're left to guess somewhat as to what actually would have to be litigated, but there's no question that we would have to serve a new expert report in order to respond to their expert report. We would have to take their expert's deposition. We would have to re-evaluate what potential additional defenses we have, what additional prior art we would need to research based on what hypothetical similarities they might identify. There's a lot. The other prejudice that could come to us, which is... What would happen if you prevail here, you proceed to trial, what happens to their case in your view? Well, their case is proceeding. And you wished them to be in their case, right? I'm sorry, Your Honor? Would you wish them to be in their case? Would I wish to... They filed a separate action. They have filed a separate action. And you're the defendant in that case. They have filed a separate action. We will have to do this anyway. That's correct. We will have to. But just so the record is clear here, the other case that they brought, not only have they named additional defendants, they seek to add six additional defendants in that case, four of which are based in the UK, four of which they have yet to serve, and they obviously are pursuing all the different damages, discovery, et cetera. So the notion that these cases are the same, they're not, and they're seeking to greatly expand the issues in dispute. Do we have any sense of what the plaintiff... Are there any other parties in the second case which would expand that case in terms of parties? Are there other possible interveners lurking in Mr. Parnas' case? Not that I'm aware of. There are co-owners of the copyright, the heirs of Marvin Gaye, who have known about this case from the get-go for now three years, and they've never sought to intervene. They don't seem to be particularly interested in it. Is there a case that you can point to, either published or unpublished, where the district court converted, where this court has approved of a district court converting a pre-motion request for a conference into a motion where the moving party didn't effectively have an opportunity to respond? Well, we have cited cases in our brief dealing with the letter motion due process issue. Standing here right now, I can't say whether any of them dealt with the specific issue about a reply, but let me just address that in a different way. There was a month between when they filed their initial letter and the judge decided, deemed the motion made and decided it. If they truly believed that we had misrepresented a fact or there was some fact that we had incorrectly stated that needed to be brought to the court's attention, they had ample opportunity to seek leave to do so. They also have their appeal brief here. They have yet to proffer anything to this court that would have any bearing on the decision on intervention, much less show that Judge Sullivan abused his discretion. I thought that they say that there are additional arguments that they would have made. Well, they have yet to articulate them, and I don't think anything would change the simple fact that where you have a case first filed in August 2016, you have the second case filed in July 2017, you have them admitting that they knew about the case shortly thereafter, you have a publicly filed case management plan in October, and the simple fact is that discovery had closed and experts had been exchanged and dealt with at the time that they sought to intervene, in and of itself, there's absolutely nothing that I can think of that could possibly change the fact that Judge Sullivan did not abuse his discretion, given the facts in this case. I would respond to the argument that, with respect to Pullman's telephone conversations with defense counsel and another attorney, that these conversations are unsworn statements and not evidence. I think I have three responses to that. One is that it's not hearsay, because we're not offering it for the truth of what was said, we're simply offering it to show that these conversations took place, and these are conversations simply to show that Mr. Pullman, the fact that he did contact defendant's counsel and did discuss the case, we're not talking about the merits of his claim, we're not talking about whether or not he was truthful in saying that he had an expert report at the time or that he was thinking of intervening, it's simply his general awareness that the fact that these conversations took place is not hearsay. Second of all, you can ignore all of these conversations if you want. In fact, Judge Sullivan really did. He didn't rely upon these conversations in denying intervention. He relied upon publicly available information, publicly filed cases, what was on the public document. He did rely on, he did certainly mention those unsworn statements in denying the motion. It's unclear. He did say, because I've read it several times, he did say, he said, I'm sure you have, he said that SAS is a sophisticated party that according to defendants was aware of this dispute and its interest in this litigation at least as early as 2016. To me, to say according to defendants could simply mean that we pointed out that it was available in the publicly available docket and that we pointed to press. That is constructive knowledge. And again, courts of this circuit have repeatedly held that it's objective criteria, not what they say they knew because they could always deny it. You look at what was publicly available and should they be held to the fact that based on the publicly available docket that widely reported on it, that they knew. That's really the only place that I see a possible reliance upon those statements. And again, I don't think that he necessarily considered it. I think you can ignore them and absolutely reach the same result. And I also think it's quite telling that they to this day still don't deny that those conversations occurred. Thank you. I'll try to be brief, but I wanted to clean up a few things. So in no particular order, because I want to make sure I hit all of them. On page A7 of the record, you will see the docket. On what page? Seventh. You'll see the docket from the second Griffin case. And you will see that on October 9, 2017, at docket entry 32, the case management and scheduling order was entered. The very next thing, except for two filing errors, is a mediation referral order. So yes, were we looking at the case management, were we looking at the docket at the time? Explain to me why that matters. Well, again, if one looks at... People try and settle cases all the time. Mediation is ordered. I mean, litigation is still alive. Mediation may fail. Why does that matter? I agree with you. And again, to be clear, I'm not saying that I looked at the docket at the time. A and B, why wouldn't you want to be part of the mediation? That's a very good question. The answer is my client, given the opportunity, would proffer he didn't know about it. He didn't know there had been a new case that was filed. And we certainly think that Judge Sullivan, and I laid it out in my papers, Judge Sullivan did accept the representations of counsel to bolster his conclusion that he didn't need to hear from us and that intervention had to be denied and that it was untimely. But again, as I pointed out in my brief, even the things that counsel says happened related to the first case. The press that they cite is from the first case. Judge Sullivan then cites it himself, but it's press about the first case. There's nothing in the record saying that the second case is widely publicized. If he had wanted to, I suppose he could have cited public articles about the second case, but he didn't. He cited the articles about the first case that Mr. Zakarin had put in his letter before. In addition, he... You didn't write the letter to Judge Sullivan saying you wanted to intervene. What prompted me was we learned of the case, started learning about how it was proceeding. We weren't in the loop on anything, but we started talking to the plaintiff's counsel in that case about what they were doing and where they were going with it. And my client, again, mostly before he even contacted me, started finding counsel to represent him and then intervene in the case because he felt that... A matter of record as to when you had those discussions? As to when we had the discussions with the plaintiff. Not in this record. I certainly could dig it up if the court was interested, but I don't know when those conversations happened. Were they right away? I mean, just shortly before? Or were they over a period of time? Well, I can tell you, and again, I'm going from memory here, I did not meet my client probably until late March or early April of 2018. And my letter was May 11th. And that was after several calls that I made to see if I could get consent to intervene. And when the answer came back it was on May 11th. So anyway, I wanted to just point out in A7 that one looking at the docket would not see any activity one way or the other, but any activity to speak of to understand where things were going. A44, I wanted to point out, was my letter, which I'm sure you've seen, my letter in which on the first page of my letter, I'm sorry, it's May 10th, not May 11th, I speak exactly about and I say, all deadlines regarding fact discovery to remain unchanged and all deadlines regarding expert discovery to remain unchanged with the following exception, and I describe the exception. Many of the things that Ms. Farkas mentioned now about how we are expanding the scope are in the other case, which I absolutely have to do because I can't count on your honors granting the relief I'm seeking here. If I don't get the relief I'm seeking here, I need to make the most of the other case that I can. If you do grant me the relief that I'm seeking here, that is our preference. Our preference is to have been in the first case, taking it as it was. We would rather participate and limit ourselves in the manner that we specifically asked for than bring a full-blown case without any limitations. That's our preference and remains our preference. So the references that Ms. Farkas made about adding defendants, that's true. We are trying to add defendants in the second case. That's another strategy that we differ from plaintiff's counsel in the Griffin case on. We have the freedom to do it in our second case. We don't have the freedom to do it in the first case. Well, we have nothing to do in the first case, but we have under our request. We would not be able to add parties. We would not be able to add fact discovery. So that's what's happening over there. Can you conclude your rebuttal? It's three minutes over. Absolutely. I would just say in response to the question that was posed to Ms. Farkas about has there been a case that has effectively done what was done to my client here on the same sort of posture, I haven't found one either. What I did find is that the Loralee case, which I cite from this court in 2015, and the Richardson-Greenshields case from 1987, both of which I cite, in both of those cases it was found that the application of the individual rules and the pre-motion process and deeming things, it wasn't that those rules are wrong, but the application of them, in one case it was called a Hobson's choice, and in the other case it was called the usurpation of power. And I would refer the court back to those two cases. And then also in the Liralee case and the Katz case, both of those cases found that in the intervention context specifically, because of the short shrift that had been given by the court below, the Second Circuit, when it got to those cases, had insufficient facts to make any kind of determination. I think the same thing applies here as well. Thank you. Thank you, Your Honor. Thank you both for your arguments. The court will reserve decision. The final case on calendar Zappin is on submission. The clerk will adjourn court.